Aaron Kaufmann, SBN 148580
Philip Monrad, SBN 151073
David Pogrel, SBN 203787
LEONARD CARDER, LLP
1330 Broadway, Suite 1450
Oakland, CA 94612
Telephone: (510) 272-0169
Facsimile: (510) 272-0174
E-mail: akaufmann@leonardcarder.com
E-mail: pmonrad@leonardcarder.com
E-mail: dpogrel@leonardcarder.com

Daniel Feinberg, SBN 135983
Kirsten Scott, SBN 253464
LEWIS, FEINBERG, LEE, RENAKER
& JACKSON, P.C.
476 9th Street
Oakland, California 94607
Telephone: (510) 839-6824
Facsimile: (510) 839-7839
E-mail: dfeinberg@lewisfeinberg.com
E-mail: kscott@lewisfeinberg.com

Peter Rukin, Esq., SBN 178336
Rosha Jones, Esq. SBN 279143
RUKIN HYLAND DORIA & TINDALL LLP
100 Pine Street, Suite 2150
San Francisco, CA 94111
Telephone: (415) 421-1800
Facsimile:  (415) 421-1700
E-mail: peterrukin@rhdtlaw.com
E-mail: rjones@rhdtlaw.com

Bryan Schwartz, SBN: 209903
Rachel Terp, SBN: 290666
BRYAN SCHWARTZ LAW
1330 Broadway, Suite 1630
Oakland, CA 94612
Telephone: (510) 444-9300
Facsimile: (510) 444-9301
Email: Bryan@BryanSchwartzLaw.com
Email: Rachel@BryanSchwartzLaw.com

Attorneys for PLAINTIFFS and the Proposed Class

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROOSEVELT KAIRY, LARRY BROWN, WAYNE DICKSON, DRAKE OSMUN, HARJINDER SINGHDIETZ, FREDERICK FERNANDEZ, YURIK ZADOV, and MUNIR AHMED on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> SUPERSHUTTLE INTERNATIONAL, INC. and SUPERSHUTTLE FRANCHISE CORPORATION, d.b.a. SUPERSHUTTLE, CLOUD 9 SHUTTLE, INC.; SUPERSHUTTLE OF SAN FRANCISCO, INC.; MINI-BUS SYSTEMS, INC.; SUPERSHUTTLE LOS ANGELES, INC.; AND SACRAMENTO TRANSPORTATION SERVICES, INC., and DOES 1 through 20, inclusive, <br><br> Defendants. | Case No.  4:08-CV-02993 JSW <br><br> **PLAINTIFFS' MOTION FOR AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS AND COLLECTIVE ACTION SETTLEMENT** <br><br> Date:     October 31, 2014 <br> Time:    9:00 am <br> Ctrm:    5 <br> Judge:   Hon. Jeffrey S. White |

1

2

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 31, 2014 at 9:00 a.m., or as soon thereafter as the matter may be heard in Courtroom 5 of the United States District Courthouse located at 1301 Clay Street, Oakland, California, before the Honorable Jeffrey S. White, Plaintiffs Roosevelt Kairy, Harjinder Singhdietz (aka Harjinder Dubb), Drake Osmun, Wayne Dickson, Larry Brown, Munir Ahmed, Frederick Fernandez, and Yurik Zadov ("Plaintiffs") will and hereby do move this Court for an Order: (1) granting final approval of the proposed class and collective action settlement; (2) confirming as final the Court's preliminary certification of the Settlement Class for settlement purposes only; (3) determining that adequate notice was provided to the Settlement Class; (4) confirming as final the Court's preliminary appointment of Settlement Class Counsel; (5) confirming as final the Court's preliminary appointment of Roosevelt Kairy, Harjinder Singhdietz (aka Harjinder Dubb), Drake Osmun, Wayne Dickson, Larry Brown, Munir Ahmed, Frederick Fernandez and Yurik Zadov as class representatives; (6) approving a payment of $7,500 to the California Labor and Workforce Development Agency (LWDA); and (7) dismissing this lawsuit with prejudice while retaining jurisdiction over the case and the Parties to the extent necessary to implement the terms of the Settlement Agreement until each act agreed to be performed by the Parties under the Settlement has been fully performed.

Plaintiffs based this motion on this Notice of Motion and Motion; the Memorandum of Points and Authorities in support of this Motion (attached below); the Settlement Agreement (previously filed, ECF# 383-1); the Declarations of Peter Rukin and Bryan Schwartz in Support of Motion for Final Approval of Class Action Settlement (filed herewith); the Declaration of Andy Morrison of Kutzman Carson Consultants LLC ("KCC") Regarding Settlement Administration and the Provision of Class Notice (filed herewith) and the Exhibits attached thereto; the argument of counsel; and all other papers and records on file in this matter.

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................ 1

II.    FACTUAL BACKGROUND ....................................................................... 1

III.   PROCEDURAL BACKGROUND ............................................................... 2

IV.    TERMS OF THE SETTLEMENT ............................................................... 4

   A.    The Settlement Class .......................................................................... 4

   B.    Monetary Relief to Class Members ..................................................... 4

   C.    Programmatic Changes For Current and Future Primary Operators ........................... 6

   D.    Settlement Administrator and Class Notice .......................................... 7

V.     NOTICE PROCESS, OBJECTIONS AND EXCLUSIONS ............................ 8

VI.    ARGUMENT ............................................................................................. 11

   A.    The Settlement Meets the Criteria for Final Approval ................................. 11

      1.    The Settlement is Fair Given the Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation ............................................. 12

      2.    The Settlement Consideration and Allocation Are Fair ................................ 14

      3.    The Settlement Reflects the Informed Views of Experienced Counsel and Is the Product of Serious, Arms-Length Negotiations Conducted After Extensive Discovery and Investigation ............................................. 16

      4.    The Lack of Opposition by the Class Supports Approval ............................... 17

   B.    Confirmation of the Court's Provisional Class Certification is Appropriate ........... 18

   C.    The Court-Ordered Notice Program Is Constitutionally Sound ...................... 19

VII.   CONCLUSION ......................................................................................... 22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Abel v. Southern Shuttle Serv. Inc.*,
  631 F. 3d 1210 (2011) ................................................................. 13

*Balderas v. Massage Envy Franchising, LLC*,
  Case No. 12–cv–06327 NC, 2014 WL 3610945 (N.D.Cal., July 21, 2014) ............................ 15

*Barcia v. Contain–A–Way, Inc.*,
  No. 07-CV-938, 2009 WL 587844 (S.D. Cal. 2009) ............................................. 18

*Bautista v. Harvest Management Sub*,
  No. 2:12-cv-10004 (ECF No. 60) (C.D. Cal. Oct. 16, 2013) .................................... 15

*Burns v. Elrod*,
  757 F.2d 151 (7th Cir. 1985). ............................................................ 19

*Christler v. Express Messenger Sys., Inc.*,
  171 Cal. App. 4th 72 (2009) ............................................................. 13

*Churchill Vill., LLC. v. Gen. Elec.*,
  361 F.3d 566 (9th Cir. 2004). ....................................................... 11, 19

*Class Plaintiff v. City of Seattle*,
  955 F.2d 1268 (9th Cir. 1992) ........................................................... 11

*Eisen v. Carlisle & Jacquelin*,
  417 U.S. 156 (1974) .................................................................... 19

*Estrada v. FedEx Ground Package Sys., Inc.*,
  154 Cal.App. 4th 1, 18-26 (2007) ........................................................ 14

*Garner v. State Farm Mut. Auto. Ins. Co.*,
  No. CV 08 1365, 2010 WL 1687832 (N.D. Cal. Apr. 22, 2010) ......................... 11, 12, 18

*Gattuso v. Harte-Hanks Shoppers, Inc.*
  42 Cal. 4th 554 (2007) .................................................................. 13

*Hanlon v. Chrysler Corp.*,

    150 F.3d 1011 (9th Cir. 1998). ............................................................. 11, 19

*In re Mego Fin. Corp. Sec. Litig.*,

    213 F.3d 454 (9th Cir.2000) ..................................................................... 15, 16

*In re Omnivision Technologies, Inc.*,

    559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................ 17

*Ma v. Covidien Holding, Inc.*,

    No. SACV 12–02161–DOC (RNBx), 2014 WL 360196 (C.D. Cal. Jan. 31, 2014) ............... 15

*Mojica v. Compass Group*,

    13-cv-1754 (ECF No. 38) (C.D. Cal. March 14, 2014) ..................................... 15

*Narayan v. EGL, Inc., et. al.*,

    285 F.R.D. 473 (2012) ...................................................................... 14

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,

    221 F.R.D. 523 (C.D. Cal. 2004) .......................................................... 17

*O'Sullivan v. AMN Services, Inc.*,

    12-cv-2125 (ECF No. 92) (N.D. Cal. Feb. 7, 2014) ..................................... 15

*Officers for Justice v. Civil Serv. Comm'n*,

    688 F.2d 61 (9th Cir.1982) .............................................................. 11, 12

*Rabanal v. Rideshare Port Management, LLC et. al.*,

    No. B239708, 2013 WL 6020340 (Cal. Ct. App. Nov. 14, 2013) .......................... 12

*Rodriguez v. West Publ'g Corp.*,

    563 F.3d 948 (9th Cir. 2009) ..................................................... 11, 12, 17

*Scott v. Bimbo Bakeries USA*,

    No. 2:10 cv 03154 (ECF No. 174) (E.D. Pa. March 5, 2014) ............................ 15

*Spencer v. BeavEx, Inc.*,

    2006 WL 6500597 (S.D. Cal. 2006) .................................................... 14

*SuperShuttle Los Angeles, Inc.*,

    NLRB Case. No. 31-CA-092489 (2013) .................................................. 13

*Tijero v. Aaron Brothers, Inc.*,

    No. C 10-01089-SBA, 2013 WL 6700102 (N.D. Cal. Dec. 19, 2013) .................................... 15

*Torrisi v. Tucson Elec. Power Co.*,

    8 F.3d 1370 (9th Cir. 1993) ................................................................................ 20

**Other Authorities**

3 *Newberg on Class Actions*, § 8:7 (5th ed.) .............................................................. 21

Manual for Complex Litig. (Fourth),

    § 21.312 ............................................................................................................... 20

Manual for Complex Litigation (Fourth)

    § 21.61 (2004) ..................................................................................................... 11

**Rules**

Federal Rule of Civil Procedure 23(b) ..................................................................... 19

Federal Rule of Civil Procedure 23(b) (3) ............................................................... 19

Federal Rule of Civil Procedure 23(C)(2) ............................................................... 20

Federal Rule of Civil Procedure 23(e) (1) ............................................................... 19

Federal Rule of Civil Procedure 23(e) (2) ............................................................... 11

## I.     INTRODUCTION

On June 12, 2014, this Court granted preliminary approval of the class and collective action settlement reached in this action against Defendants[1] to resolve state and federal wage and hour claims on behalf of a Settlement Class of current and former operators of SuperShuttle-branded vans ("June 12 Order").  Since the Court issued its June 12 Order, Class Members' reaction to the Settlement has been overwhelmingly positive.  The Class received Notice of the Settlement, only one Class Member objected to the Settlement, and only 12 Class Members (out of more than 3000) have opted out of the Settlement.  The response from the Class confirms Class Counsel's view that the Settlement is reasonable and in the best interests of the Class, and underscores the correctness of the Court's initial determination that the Settlement is "well within the range of reasonableness of a settlement that ultimately could be given final approval by the Court."  June 12 Order at 3.  Accordingly, Plaintiffs respectfully request that the Court grant final approval of the Settlement.

## II.     FACTUAL BACKGROUND

SuperShuttle International, Inc. ("SuperShuttle"), a wholly-owned subsidiary of Veolia Transportation, Inc., provides shared-ride airport transportation to and from all major California airports, including San Francisco, Sacramento, Los Angeles, Ontario, Orange County, and San Diego.  SuperShuttle operates in each market through wholly-owned companies referred to as "City Licensees."

In approximately 2001, SuperShuttle began moving from an employee model to an independent contractor franchise system, under which all Drivers had to complete a franchise agreement or agree to serve as a sub-driver for a franchisee.[2]  The franchises cost approximately $21,000 and $50,000, which most drivers financed through SuperShuttle.  Under this franchise

---

[1] Defendants" refers to SuperShuttle International, Inc. ("SSI"), SuperShuttle Franchise Corporation ("SSFC"), and the City Licensees: Cloud 9 Shuttle, Inc., SuperShuttle of San Francisco, Inc., Mini-Bus Systems, Inc., SuperShuttle Los Angeles, Inc., and Sacramento Transportation Services, Inc.

[2] Certain Drivers operating from the Ontario Airport operated under an "Independent Owner-Driver Subcarrier Agreement," not a Franchise Agreement. For ease of reference here, all Primary Operator Drivers who worked under contract with any of SuperShuttle's City Licensees is referred to as a "Franchisee."

system, Drivers have had to pay all van-related expenses, "System Fees" of approximately $250 to $325 a week for accessing SuperShuttle's dispatch system, SuperShuttle license fees that have amounted to 25 percent of fares, and other fees and costs of business.

Because SuperShuttle considers Drivers to be independent contractor franchisees, not employees, it has not attempted compliance with California and federal employment laws. Drivers' only compensation has been their percentage of passenger fares and tips. SuperShuttle has not guaranteed a minimum wage, paid overtime wages, reimbursed Drivers for reasonable business expenses, or provided them with off-duty meal periods.

Plaintiffs in this case alleged that SuperShuttle has misclassified Drivers as franchisees/independent contractors, and in doing so has failed to pay Drivers for out-of-pocket business expenses, overtime pay, minimum wages, and failed to comply with California meal period laws. SuperShuttle maintains that at all times the franchisees and the non-franchisee Drivers of Supershuttle vans have properly been classified as non-employees of Supershuttle and the City Licensees.

III.   **PROCEDURAL BACKGROUND**

This case was filed on May 8, 2008 in Alameda County Superior Court, asserting claims for minimum wage, overtime, meal period pay, unreimbursed business expenses, unlawful wage deductions and related penalties under the California Labor Code and Unfair Competition Law, Business & Professional Code § 17200. On June 17, 2008, SuperShuttle removed this action to this Court. In January 2009, Plaintiffs amended the complaint to bring federal Fair Labor Standards Act ("FLSA") claims for overtime and minimum wages. ECF# 45. On May 21, 2009, this Court certified a FLSA collective action (ECF# 124), and approximately 370 drivers opted into the case.

On August 17, 2009, SuperShuttle moved to dismiss the case on the grounds that Plaintiffs had failed to join all necessary parties (ECF# 139), and simultaneously moved to dismiss the California claims for lack of subject matter jurisdiction. ECF# 146. On October 16, 2009, Plaintiffs filed their motion for class certification of the California state law claims. ECF# 183. Before SuperShuttle filed its opposition to class certification, however, this Court

dismissed Plaintiffs' state law claims on the ground that the California Public Utilities Commission had exclusive jurisdiction over airport van drivers. ECF# 222.  On November 3, 2011, the Ninth Circuit reversed the order dismissing Plaintiffs' state law claims and held that this Court retained subject matter jurisdiction.  *Kairy v. SuperShuttle Int'l.*, 660 F.3d 1146 (9th Cir. 2011).

Following remand to this Court, SuperShuttle sought to enforce the arbitration provisions in the Drivers' franchise agreements by moving to stay all proceedings and send four named plaintiffs[3] and most opt-ins to arbitration. ECF# 261.  On September 20, 2012, this Court granted Defendants' motion.  The Court ordered that the arbitrations proceed individually, and that sub-drivers must arbitrate as well. ECF# 362.  The Court declined to rule on Plaintiffs' unconscionability defense to several franchise agreement provisions that define the parameters for the arbitration, reasoning that these terms were not contained within the body of the arbitration clause, but did strike the provision that required the drivers to share the costs of arbitration.  *Id*. at 11-13.  The Court also denied without prejudice Plaintiffs' motion to amend filed earlier that year, which, among other things, would have created a subclass of sub-drivers. *Id.* at 14.  Because not all franchise/independent contractor agreements contain an arbitration provision, and some agreements could not be located, the claims of approximately 45 opt-ins remained with this Court.

The Ninth Circuit granted interlocutory review of the order compelling arbitration and granted the Parties an extension of the briefing schedule to allow them to enter into mediation. Following several days of mediation, the Parties entered into a Memorandum of Understanding on January 13, 2014. That MOU was the basis for the Settlement Agreement executed in April 2014 and presented to the Court for approval.

On June 12, 2014, this Court granted Plaintiffs' motion for preliminary approval of the class action settlement.  The Court determined that the Settlement was "well within the range of

---

[3] Plaintiff Dubb (*nee* Singhdietz) was not subject to Defendants' Motion to Compel Arbitration, and Munir Ahmed, Frederick Fernandez, and Yurik Zadov were not named Plaintiffs at the time of defendant's filing of the motion to compel arbitration.

reasonableness of a settlement that ultimately could be given final approval by the Court" and that it was "the result of extensive, arm's-length negotiations among the parties after Class Counsel investigated the Class's claims and became familiar with the strengths and weaknesses of the case." June 12 Order at 3. The Court went on to provisionally certify the Settlement Class, directed that the Settlement Administrator send Class Notice, and set a final approval and fairness hearing for October 31, 2014. *Id.*

## IV. TERMS OF THE SETTLEMENT

### A. The Settlement Class

The Settlement Class includes two subclasses: (1) the Primary Operators Sub-Class (all individuals who have had a franchise or owner-operator agreement with Cloud 9 Shuttle, Inc., SuperShuttle of San Francisco, Inc., Mini-Bus Systems, Inc., SuperShuttle Los Angeles, Inc., or Sacramento Transportation Services, Inc. between May 8, 2004 through June 12, 2014 (the date of preliminary approval); and (2) the Secondary Operators Sub-Class (all individuals who have operated a SuperShuttle-branded van under arrangements made with one or more Primary Operators at any time between May 8, 2004 through June 12, 2014 (the date of preliminary approval).[4]

### B. Monetary Relief to Class Members

The Parties negotiated a $12,000,000 cash settlement on behalf of just over 3,000 Class Members. The Settlement is inclusive of payments to the Class, attorneys' fees, litigation costs, service awards to class representatives, and payments to the state for Private Attorneys' General Act penalties, and exclusive of $100,000 settlement administration costs. Class Members do not need to submit a claim to receive their settlement payments, and there is no reversion to the Defendants. ECF# 383-1, ¶¶ 28, 47. Settlement Class Members who are Primary Operators are required to sign an Acknowledgement Form in order to receive their settlement payments. *Id,* ¶ 47.

---

[4] The Class Action Settlement Agreement and Release of Claims ("Settlement Agreement"), including all Exhibits, is attached as Exhibit 1 to the Declaration of Aaron Kaufmann in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement ("Kaufmann Decl.") filed in support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement. ECF# 383-1.

Settlement payments to Class Members will be distributed amongst Settlement Class Members based upon the approximate number of weeks worked during the Class Period.  Each week worked by a Secondary Operator will be valued at 65% of the value of each week worked by a Primary Operator, in recognition of the greater expenses and risk incurred by Primary Operators.  *Id*, ¶ 32; Rukin Decl., ¶ 9; Schwartz Decl., ¶ 4.  The formula for calculating Individual Settlement Shares will be as follows:

(a) Each Settlement Class Member shall be entitled to receive a pro-rata portion of the Net Settlement Fund (his/her "Individual Settlement Share"), based on the number of weeks (or partial weeks) spent by each class member conducting business as a Primary and/or Secondary Operator during the Class Period. ECF# 383-1, ¶ 30.

(b) Since Defendants do not maintain data based on "workweeks," conclusions about weeks "worked" were determined by Plaintiffs from Defendants' available data. Defendants submitted available data to Class Counsel and the Settlement Administrator from which Class Counsel and the Settlement Administrator approximated the number of weeks of operation by each Settlement Class Member during the Settlement Period. *Id.*

(c) Each Settlement Class Member who filed a Consent-to-Join Form prior to December 31, 2013 will receive an Opt In Settlement Share of $500 from the Net Settlement Fund in recognition of their additional participation in the Litigation in connection with the additional claims they have asserted under the federal Fair Labor Standards Act for minimum wage, overtime, and liquidated damages—claims which present alternative theories of recovery and/or may have value in addition to the California minimum wage and overtime claims brought on behalf of the Class. *Id.*, ¶ 32.

(d) The remainder of the Net Settlement Fund after payment of all Opt In Settlement Shares will be distributed by the number of weeks the Settlement Class Members operated during the Settlement Period. *Id.*

(e) Every Settlement Class Member shall be entitled to recover an Individual Settlement Share that shall be calculated based upon the following formula, using each individual Settlement Class

Member's own total number of weeks operated as a Secondary
Operator and Primary Operator:

$$\text{Net Settlement Fund} \times \left[ \frac{(\text{POSM Operating Weeks}) + (\text{SOSM Operating Weeks} \times .65)}{(\text{Operating Weeks for all POSMs}) + (\text{Operating weeks for all SOSMs} \times .65)} \right]$$

Using the formula described above, the Settlement Administrator, with assistance from Class Counsel, calculated the number of weeks operated by each member of the Settlement Class, the amount to be paid per operating week, and the Individual Settlement Share expected to be paid to each member of the Settlement Class. *Id*, ¶¶ 30-33.

The Settlement also provides that the following sums will be deducted from the Gross Settlement Fund (subject to Court approval) for each of the following: (1) service payments of up to $100,000 total for all of the Named Plaintiffs as compensation for their services on behalf of the Class; (2) payment of $7,500 to the California Labor and Workforce Development Agency (LWDA); (3) any fees of the Settlement Administrator in excess of $100,000, (4) Class Counsel's attorneys' fees, not to exceed one-third of the Settlement Fund ($4,000,000), and (5) litigation costs not to exceed $300,000. *Id*, ¶ 26.

In exchange for the creation of the Settlement Fund, Plaintiffs and the Class will release all claims against Defendants that were alleged in the Third Amended Complaint or that could have been brought based on the specific factual allegations contained in the Third Amended Complaint. The full release is set forth in the Settlement Agreement and Release of Claims. *Id*, ¶ 63.

### C.   Programmatic Changes For Current and Future Primary Operators

Defendants have agreed to make certain changes to their franchise operations, and to provide new franchise agreements and modifications to existing franchise agreements and other documents to reflect such changes. The operational changes are detailed in the Operational Changes Addendum (Exhibit A to the Settlement Agreement). The most significant programmatic changes to the franchise agreements, which will further enhance the independence of current (and future) franchisees, strengthen their independent contractor status, and provide them with additional entrepreneurial opportunities, include:

1) Franchisees are permitted to suspend their System Fees for up to six (6) weeks per calendar year, increased from the prior allowance of four (4) weeks per year.  This benefit will also be publicized to Drivers as many franchisees were not aware of the previous four (4)-week allowance.  The estimated value of this increased benefit is up $375,000 per year for current SuperShuttle franchisees;

2) Franchisees who wish to sell their time-limited franchises will be able to sell or otherwise transfer the franchise as an undepreciated asset, therefore facilitating the sale at the existing market price for new Supershuttle franchises, subject to certain conditions.  The estimated value of this benefit is up $17.5 Million, depending how many of SuperShuttle's approximately 500 franchisees exercise this option;

3) Franchisees who are terminated by SuperShuttle will maintain their right to sell their franchise for a 90-day period after termination, subject to certain conditions; and

4) Defendants will establish and "Franchise Van Marketing Exchange" to facilitate the sale or transfer of vans to, from, and between franchisees.

Defendants will reduce the interest rate on current and future franchisees who have (or will) finance the payment for their franchise purchases through the SuperShuttle, from 12.00% per annum to 9.00% per annum.  The parties estimate the value of this interest rate reduction to be between $300,000 and $750,000 for current franchisees, in addition to the significant value to future franchisees who can finance their franchises at the reduced interest rate.

### D.     Settlement Administrator and Class Notice

The Settlement designates KCC as the Settlement Administrator, and provides that KCC shall send Notice Packages via first class mail to the last known addresses of Settlement Class Members.  The Settlement Provides that the Notice Package shall include a copy of the Notice approved by the Court and a Computation of Estimated Settlement Share Form setting forth the estimated settlement calculation for the particular Class Member, a description of how that settlement amount was calculated, and information about how to dispute the individual settlement amount.  ECF# 383-1, ¶¶ 43-44, 52-53.  The Settlement Administrator's fees are estimated to be approximately $65,000, well under the $100,000 threshold that begins to subtract

from the class recovery.

The Notice approved by the Court informs Class Members of all material terms of the Settlement, including the procedures for objecting to the Settlement, requesting exclusion from the Settlement, and challenging information regarding the Class Members' dates of operation as a Driver on the Computation of Estimated Settlement Share Form.  Declaration of Andy Morrison Re: Notice Procedures ("KCC Decl"), Exh. A. Pursuant to the Court's Preliminary Approval Order, objections to and requests for exclusion from the Settlement shall be deemed timely if they bear a postmark no later than 45 days after the date the Class Notice Packages is mailed to the Settlement Class (or, in the event of re-mailing, within the greater of (a) the remainder of the objection and opt-out period; or (b) fourteen (14) calendar days from the date of re-mailing). June 12 Order at 4.

## V.    NOTICE PROCESS, OBJECTIONS AND EXCLUSIONS

On July 8, 2014, KCC received from SuperShuttle a computerized list of 4,047 names, characterized as the Class Member List, i.e., all individuals who operated a SuperShuttle-branded van at some time between May 8, 2004 and June 12, 2014.  KCC caused the addresses in the Class Member List to be updated using the National Change of Address system, which updates addresses for all people who had moved during the previous four years and filed a change of address with the U.S. Postal Service.  New addresses were found for 412 class members and the Class Member List was updated with these new addresses. KCC Decl., at ¶¶ 4-5.

From the computerized list of 4,047 names of class members, KCC consolidated 954 records that were duplicates, and removed one (1) record from an individual who did not work during the class period, resulting in 3,092 names and remaining on the Class Member List; (403 FLSA Subclass members and 2,689 Non-FLSA Subclass members.)  KCC Decl., at ¶ 6.

On July 31, 2014, KCC mailed 2,843 Notice Packets by First Class postage at the U.S. Post Office in Burr Ridge, Illinois.  At the time of this initial mailing, KCC did not have any address information for the remaining 249 Class Members because Defendant's database did not include any address information for these individuals.  Between August 18, 2014 and September 12, 2014, as a result of receiving updated addresses from Plaintiffs' and Defendant's counsel,

locating addresses via Accurint, or by being contacted by Class Members directly, KKC obtained address information for 111 of these Class Members and mailed initial Notice Packets to them as follows: 32 on August 18, 2014; 29 on August 20, 2014; three (3) on August 26, 2014; three (3) on September 4, 2014; and 44 on September 12, 2014. KCC Decl., at ¶¶ 10-11. The response deadline for Class Members to opt out, object, and/or dispute the calculation of their individual settlement shares was September 16, 2014.[5] All notices mailed on or after August 20, 2014 had an adjusted response deadline set 45 days after the mailing date of their Notice Packet.

Between July 31, 2014 and September 19, 2014, ten (10) Notice Packets were returned to KCC by the U.S. Postal Service with forwarding addresses. KCC caused the Class Member List to be updated with the new addresses and Notice Packets to be re-mailed to the class members at each of these new addresses. During that same period, 558 Notice Packets were returned to KCC by the U.S. Postal Service without forwarding addresses. KCC conducted address searches using credit and other public source databases to locate new addresses for 500 of these class members. 58 class members were not searched because they had previously contacted KCC to advise the administrator of their new address. Of the 500 class members searched, new addresses were found for 400 of them and no new addresses were found for 100 of them. The Class Member List was updated with these new addresses and Notice Packets were re-mailed to these 400 class members using the new addresses. Of the 400 class members with newly found addresses, 48 were returned by the U.S. Postal Service once more without a forwarding address. These addresses were not searched again. Altogether, there are 136 class members with known bad addresses (48 mailed, returned, searched, re-mailed and returned once more by the U.S. Postal Service a second time; and 88 initially searched without a new address being found). KCC Decl., at ¶¶ 12-15.

Additionally, there are 130 Class Members for whom no address could be located.

---

[5] As of September 10, 2014, there were 175 Class Members for whom KCC lacked any address information. By running Accurint searches, KCC was able to locate what it deemed to be reliable address information for an additional 44 Class Members. Notice Packages were mailed to those additional 44 Class Members on September 12, 2014, and the opt-out/objection period for those additional 44 Class Members is set to expire October 27, 2014.

SuperShuttle was not able to provide KCC with address or other identifying information for these individuals, Plaintiffs' counsel could not independently locate any such information, and the skip traces that KCC ran for these individuals using Accurint did not produce reliable address information.[6]  As a result, KCC was unable to mail Notice Packages to these 130 Class Members. KCC Decl., at ¶ 15.  *See* Section VI.C., *infra*, for the Parties' proposal to attempt to locate these individuals, and ensure they are not inadvertently releasing potential claims in the event Counsel are not able to locate them to provide their settlement payments and opportunity to opt out.

As of September 19, 2014, 66 Challenges have been filed by Class Members.  The Parties have authorized KCC to grant 37 of the 66 Challenges received to date, and the necessary updates have been applied to the Class Member List for the Challenges approved. KCC Decl., at ¶ 20.  Counsel and KCC will review the remaining 29 Challenges, which were only received for review by Counsel on September 16, 2014, and provide the Court with the results of those Challenges in the event any of them are not granted.

KCC has received five (5) requests from individuals to be added to the class list.  Counsel authorized KCC to add three (3) of these individuals to the Class List.  KCC Decl., at ¶ 21.

KCC is responsible for receipt of all requests for exclusion from and objections to the Settlement.  To date, KCC has received 12 requests for exclusion from the Settlement, and one objection to the settlement.  KCC Decl., at ¶¶ 18-19.[7]

There are 111 Class Members for whom the deadline to Challenge, object, or request exclusion was extended beyond the September 16, 2104 deadline because their notice was mailed at a later time.  The deadlines for these Class Members to submit any of the above are October 6, 2014 and October 27, 2014.  If any of these Class Members file a timely objection or

---

[6] All of these searches were run without address information, which resulted in a high number of unreliable returns.  KCC deemed the results for 44 Class Members to be sufficiently reliable as to warrant the mailing of Notice. KCC Decl., at ¶¶ 11, 15.

[7] The objection was received by KCC on September 18, 2014, just one day before this motion was due to be filed.  Plaintiffs will review the objection and may file a supplemental brief before the hearing date addressing the issues raised by the objector.

1  request for exclusion, Class counsel will file a supplemental brief – in advance of the hearing on

2  this motion – to update the Court regarding any objections or opt outs.[8]

3  **VI.   ARGUMENT**

4    **A.    The Settlement Meets the Criteria for Final Approval**

5       Courts strongly favor settlement, particularly in complex class actions.  *Class Plaintiffs v.*

6  *City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992); *see also Churchill Vill., LLC. v. Gen. Elec.*,

7  361 F.3d 566, 576 (9th Cir. 2004).  It is within the trial court's sound discretion to approve

8  settlements in class action cases.  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir.

9  1998).  In determining final approval, the court's inquiry under Federal Rule of Civil Procedure

10  Rule 23(e), is whether the settlement is "fair, adequate, and reasonable."  FED. R. CIV. P. 23(e)

11  (2).  A class action settlement meets this standard when "the interests of the class are better

12  served by the settlement than by further litigation."  Manual for Complex Litigation (Fourth) §

13  21.61 (2004).  Courts generally will not intrude into the private consensual agreement negotiated

14  between the parties except to ensure that the settlement "is not the product of fraud or

15  overreaching by, or collusion between, the negotiating parties."  *Garner v. State Farm Mut. Auto.*

16  *Ins. Co.*, No. CV 08 1365, 2010 WL 1687832, at *8 (N.D. Cal. Apr. 22, 2010) (Wilken, J.)

17  (citing *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir.1982)).

18       In deciding whether a class action settlement is fair, adequate and reasonable, courts in

19  the Ninth Circuit consider the following factors:  (1) the strength of the Plaintiff's case; (2) the

20  risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining

21  class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of

22  discovery completed, and the stage of the proceedings; (6) the experience and views of counsel;

23  (7) the presence of a governmental participant; and (8) the reaction of the class members to the

24  proposed settlement.  *Rodriguez v. West Publ'g Corp.,* 563 F.3d 948, 963 (9th Cir. 2009)

25  (overruled on other grounds).  In this case, these factors weigh heavily in favor of final approval

26  because the benefit of a considerable non-reversionary financial recovery of $12,000,000, plus

27

28  ────────────
[8] Any supplemental filing will also include a supplemental declaration from KCC.

substantial programmatic changes by Defendants, outweighs the risks, costs, and delays inherent in further class litigation.

        1.     **The Settlement is Fair Given the Strength of Plaintiffs' Case and the Risk, Expense, Complexity, and Likely Duration of Further Litigation**

Courts assess the likelihood of success not by a particular formula, but instead by "delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625. Rather than reaching any conclusions on the contested legal and factual issues, a court may "presume that through negotiation, the Parties, counsel, and mediator arrived at a reasonable range of settlement by considering Plaintiff's likelihood of recovery." *Garner,* 2010 WL 1687832 at *9 (citing *Rodriguez*, 563 F.3d at 965).

Here, the first, second, and third factors all support final approval of this Settlement. Although Plaintiffs believe they would ultimately prevail if this case went to trial, they recognize the very substantial risks associated with further litigation. *See* Rukin Decl., ¶¶ 6-7. Plaintiffs have alleged that through contracts and operational policies and practices, Defendants have retained sufficient control to support a finding that the Primary and Secondary Operators were Defendants' employees for purposes of the relevant state and federal employment statutes. Plaintiffs understand, however, that they faced significant risk of failing to establish *de facto* employment status, in part because the Court could find that some of the controls that Defendants maintained over Plaintiffs and the proposed Class reflect government regulatory mandates and hence were not indicia of employee status. A trial court in Southern California reached this conclusion in a summary judgment ruling that was affirmed in November 2013. *See Rabanal v. Rideshare Port Management, LLC et. al.*, No. B239708, 2013 WL 6020340 at *9 (Cal. Ct. App. Nov. 14, 2013) (many control factors offered by plaintiffs were required by the City of Los Angeles and the Public Utilities Commission and thus were not indicia of employee status).

Additionally, under the current franchise model, proposed Primary Operator Class Members have maintained some agency: they set their own schedules (within certain limits);

have some discretion over which offers they will accept for inbound passengers;[9] hire, schedule and pay sub-operators to drive their vans (subject to approval); select and pay vendors; arrange for charter use of their vans; and have certain flexibility in using their vans for commercial and personal purposes other than servicing SuperShuttle customers.  Rukin Decl., ¶ 7.  These factors have contributed, in part, to defense verdicts in other cases.  *See e.g., Christler v. Express Messenger Sys., Inc.*, 171 Cal. App. 4th 72 (2009).  SuperShuttle also had a favorable decision from the National Labor Relations Board, finding its Drivers properly classified as independent contractors for purposes of the National Labor Relations Act.  *SuperShuttle Los Angeles, Inc.*, NLRB Case. No. 31-CA-092489 (2013).[10]

Plaintiffs also faced unique challenges in advancing the claims of Secondary Operators.  Although many Secondary Operators have strong claims that they were misclassified as independent contractors, the fact that they were largely selected, scheduled, retained and paid by Primary Operators (with whom they have separate and varied financial and business relationships) meant that Plaintiffs faced significant risk of being unable to establish that Secondary Operators are or were *Defendants'* employees.  Schwartz Decl. ¶ 5.

Even assuming that Plaintiffs could establish employee status, SuperShuttle would have advanced numerous defenses to liability and damages.  On the minimum wage and overtime claims under the FLSA, for example, Defendants would likely have relied on *Abel v. Southern Shuttle Serv. Inc.*, 631 F. 3d 1210 (2011), a decision finding employee airport shuttle drivers fell within the Motor Carrier Act ("MCA") exemption from the FLSA.  With respect to the expense reimbursement and wrongful deduction claims, SuperShuttle likely would have asserted that it paid increased compensation to Drivers to reimburse them for their reasonable business expenses.  *See Gattuso v. Harte-Hanks Shoppers, Inc.,* 42 Cal. 4th 554, 575 (2007) (holding that, if certain conditions are met, an employer can satisfy its duty to reimburse its employees for

---

[9] The Parties dispute whether Drivers can exercise this discretion in all cases.

[10] In contrast, the California Unemployment Insurance Appeals Board has ruled that SuperShuttle Drivers were "employees," subjecting the company to unemployment insurance taxes and certifying its decision as Precedent. *SuperShuttle International, Inc., v. Employment Development Department*, CUIAB Precedent Tax Decision No. P-T-502. (SuperShuttle's appeal to this decision is pending).

business expenses by paying advanced compensation).  Further, at the damages phase, Drivers

might have been limited to recovering only certain categories of expenses, or only those

expenses for which they maintained many years' worth of detailed receipts. *Estrada v. FedEx*

*Ground Package Sys., Inc.*, 154 Cal.App. 4th 1, 18-26 (2007).

Of course, Plaintiffs would have faced these merits and damages challenges only had

they cleared earlier hurdles. Most immediately, Plaintiffs faced the possibility that the Ninth

Circuit might affirm this Court's order compelling individual arbitrations for 325 of the opt-ins

as well as for sub-drivers.

Finally, even if the Ninth Circuit reversed this Court's order, Plaintiffs acknowledge a

substantial risk that they would have been unable to obtain class certification and establish the

common issues predominate over individual issues.  For example, this Court could have found

that Drivers operated under different "business models" during the liability period and had

varying opportunities for profit.  Or the Court could have found that Secondary Operators had

completely different and individualized arrangements with their Primary Operators.  Such

findings may have resulted in a denial of class certification.  *See e.g., Narayan v. EGL, Inc., et.*

*al.,* 285 F.R.D. 473, 480 (2012); *Spencer v. BeavEx, Inc.*, 2006 WL 6500597 (S.D. Cal. 2006).

Without conceding that any adverse rulings would have been justified, Plaintiffs

recognize the risk of such outcomes. This Settlement permits the Class to avoid those risks, and

ensures that Class Members receive substantial financial and programmatic benefits now,

without delay.

### 2.    The Settlement Consideration and Allocation Are Fair

The financial benefits provided to the Class in this Settlement are, as the Court has

already noted, "well within the range of reasonableness" and favor final approval. June 12 Order

at 3.  The net cash settlement amount to be paid to Drivers under the proposed settlement (after

payment of class counsel fees and expenses, PAGA penalties, and Plaintiffs' service awards),

will be approximately $7,592,500.[11]  The average Class Member payout will be approximately

---

[11] As noted above, the Settlement Agreement provides that the entire Net Settlement Fund will be paid out
to proposed Class Members.  The amount of any settlement payment check(s) that remain uncashed after

$2,500. Rukin Decl., ¶ 9. Standing alone, the cash amount of the settlement is fair, adequate and reasonable given the risks of continued litigation. *See In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 459 (9th Cir. 2000) (finding a recovery of one-sixth of the potential recovery to be fair under the circumstances); *Mojica v. Compass Group,* 13-cv-1754 (ECF No. 38) (C.D. Cal. March 14, 2014) (preliminary approval to a $5 million settlement for 22,000 Compass Group food service employees, with a net settlement fund of $3,175,834, and with only a 25% guaranteed pay-out to claimants ($793,958.50) for 1.6 million workweeks)); *Scott v. Bimbo Bakeries USA,* No. 2:10 cv 03154 (ECF No. 174) (E.D. Pa. March 5, 2014) (approving settlement of wage and hour claims alleging independent contractor misclassification for payments of $900 to each current driver and $450 to each former driver); *O'Sullivan v. AMN Services, Inc.,* 12-cv-2125 (ECF No. 92) (N.D. Cal. Feb. 7, 2014) (Spero, M.J.) ($3 million for a class of 11,685 people – total exposure estimated for the case was $108 million, before penalties and interest); *Ma v. Covidien Holding, Inc.,* No. SACV 12–02161–DOC (RNBx), 2014 WL 360196, at *2, 5 (C.D. Cal. Jan. 31, 2014) (finding that settlement providing "9.1% of the total value of the action [was] 'within the range of reasonableness'"); *Tijero v. Aaron Brothers, Inc.,* No. C 10-01089-SBA, 2013 WL 6700102 at *3 (N.D. Cal. Dec. 19, 2013) (granting preliminary approval of settlement of wage and hour claims where the average recovery would be between approximately $28 and $45); *Bautista v. Harvest Management Sub,* No. 2:12-cv-10004 (ECF No. 60) (C.D. Cal. Oct. 16, 2013) (preliminarily approving a $2.2 million settlement of wage-and-hour violation claims of 14,000-member class); *Balderas v. Massage Envy Franchising, LLC,* Case No. 12–cv–06327 NC, 2014 WL 3610945, *5 (N.D.Cal., July 21, 2014) (approving settlement where gross settlement amount "represents roughly eight percent of the maximum recovery").[12]

---

180 days, the remainder will be credited back to the Net Settlement Fund and distributed pro-rata, to those members of the Class who did cash their settlement checks, according to the distribution formula.  ECF# 383-1, ¶ 55.  Any remaining funds after this second distribution (subject to Court approval) will be distributed to the *cy pres* beneficiary, Legal Aid Society-Employment Law Center (San Francisco, CA). *Id.*

[12] Although the potential exposure to SuperShuttle should Plaintiffs have prevailed at every stage of the litigation was significantly larger than the recovery here (Rukin Decl., ¶ 6), that fact "does not per se

1       The cash payments are not the only settlement consideration, however. The Settlement

2   also provides for substantial programmatic changes to the SuperShuttle franchise program for the

3   benefit of current and future franchisees.[13] These changes, described in Section IV.C., *supra*,

4   were negotiated at the urging of the operators themselves, and have real economic value to any

5   Class Members who may work under the franchise system at some point in the future. Rukin

6   Decl., ¶ 10. While the full financial value of certain of the changes is difficult to quantify with

7   precision, the parties estimate the total value of the programmatic changes to be millions of

8   dollars.[14]

9       Finally, the plan of allocation is also fair and reasonable. The Settlement provides that the

10   settlement funds shall be of allocated based on the best available records from which to estimate

11   the number of weeks Class Members worked during the Settlement Period, a standard allocation

12   methodology in wage and hour cases.  The higher allocation to Primary Operators compensates

13   these Class Members for the increased risks they have incurred by signing long-term franchise

14   agreements with Defendants and the additional costs associated with being a contract signatory

15   (including franchise fees and dispatch fees paid to SuperShuttle and insurance costs that are

16   typically not paid by Secondary Operators).

       **3.**      **The Settlement Reflects the Informed Views of Experienced Counsel and Is the Product of Serious, Arms-Length Negotiations Conducted After Extensive Discovery and Investigation**

19       The fifth and sixth factors—the informed views of counsel and the discovery conducted

20   to date in the litigation—also support final approval of the Settlement. Prior to settlement, Class

21   Counsel had spent nearly 10,000 hours litigating this case.  They had responded to two motions

---

render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459.  As noted above, Class Counsel would have faced significant difficulty at the class certification and liability stages, and consider the recovery here substantial in light of those expected difficulties, Rukin Decl., ¶¶ 6-8.

[13] A copy of the Programmatic Changes was submitted as Exhibit 1 to the Declaration of Aaron Kaufmann in Support of Preliminary Approval, and a summary of its terms was attached as Exhibit 2 to the same.  ECF# 383.  Plaintiffs' best estimates of the monetary value of these programmatic changes are also on file with the Court.  *See* Mem. Of Points and Authorities in Support of Motion for Order Approving Award of Class Representative Service Payments, Attorneys' Fees, and Costs, pp. 1-2. ECF# 394.

[14] *Supra* at 7.

to dismiss and a motion to compel arbitration, twice prepared a motion for class certification, and prosecuted two appeals to the Ninth Circuit.  Class Counsel had interviewed hundreds of Class Members, reviewed over 70,000 pages of documents, propounded and responded to nearly a thousand interrogatories, deposed several corporate witnesses, and defended 13 depositions (including the named Plaintiffs, six opt-in plaintiffs, and two sub-drivers).  Rukin Decl., ¶ 3. Class Counsel's extensive case work over six years ensured that they had a "good grasp on the merits of their case before settlement talks began." *Rodriguez*, 563 F.3d at 967 (finding experience of counsel and stage of proceedings weighed in favor of affirming district court's approval of settlement).  Under these circumstances, Class Counsel's assessment that the Settlement is fair, adequate, and reasonable is worthy of deference.  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("'Great weight' is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.").

### 4.    The Lack of Opposition by the Class Supports Approval

"It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."  *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1043 (N.D. Cal. 2008) (citing *Nat'l Rural Telecomms. Coop.*, 221 F.R.D. at 528–29).  As described above, pursuant to the Court's preliminary approval order, the Settlement Administrator mailed the Notice and Computation of Estimated Settlement Share Forms to all Class Members identified through the data provided by SuperShuttle.  KCC Decl., ¶ 10.  The initial deadline to object to the Settlement was September 16, 2014, with an extended deadline for 111 Class Members.[15]  KCC Decl., ¶ 11.  To date, the Claims Administrator has received a single objection to the settlement, and only 12 Class Members have excluded themselves from

---

[15] As explained above (*supra* at 8-9), the objection deadline for 29 Class Members who were first mailed notice on August 20, 2014  was extended until October 6, 2014.  The deadline for 44 Class Members who were first mailed notice on September 12, 2014 is set to expire on October 27, 2014.  Class Counsel shall inform the Court via supplemental filings if any objections or requests for exclusion are received between September 19 and October 27, 2014.

the Settlement.  KCC Decl. ¶¶ 18-19.  The small number of objections and extremely low opt-out rate confirms the correctness of this Court's preliminary determination that the Settlement is "well within the range of reasonableness of a settlement that ultimately could be given final approval by the Court." ECF# 388 at p. 3; *Barcia v. Contain–A–Way, Inc.*, No. 07-CV-938, 2009 WL 587844, at *4 (S.D. Cal. 2009) (absence of objectors "strongly supports the fairness, reasonableness, and adequacy of the settlement").[16]

### B.        Confirmation of the Court's Provisional Class Certification is Appropriate

Plaintiffs also request that the Court confirm its provisional certification order and find that the proposed Settlement Class meets all the requirements under Rule 23. Specifically, Plaintiffs ask the Court to finally certify the following class for settlement purposes: all individuals who have operated SuperShuttle-branded vans in California during the Settlement Period and who fall within one or both of the following two subclasses: (1)  a "Primary Operators Sub-Class" consisting of all individuals who have signed a franchisee or owner-operator agreement with any Defendant to operate a SuperShuttle-branded van at any time between May 8, 2004 and June 12, 2014; and (2) a "Secondary Operators Sub-Class" consisting of all individuals who have operated a SuperShuttle-branded van under arrangements made with one or more Primary Operators at any time between May 8, 2004 and June 12, 2014.

The provisionally certified class satisfies each of the certification requirements that:  (1) the individuals in the settlement class are so numerous that joinder would be impracticable; (2) there is a question of law or fact common to the class; (3) the Named Plaintiffs' claims are typical of the claims of the absent settlement class members; and (4) Plaintiffs and their counsel will adequately and fairly represent the interests of the absent settlement class members.

---

[16] Nor has any governmental entity objected to the Settlement.  Because this case was removed to this Court under the Class Action Fairness Act (CAFA), on July 18, 2014 Defendants provided notice of the Settlement to the United States Attorney General and the Attorney General of California. Courts have noted that "[a]lthough CAFA does not create an affirmative duty for either state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Garner*, 2010 WL 1687832 at *14.  To date, no federal or state official has raised any concerns.

*Hanlon*, 150 F.3d at 1019; June 12 Order at 1.  In addition, Plaintiffs have established that the Class is maintainable under Fed. R. Civ. P. 23(b)(3) because common questions "predominate over any questions affecting only individual members," and class resolution "is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. Pro. 23(b)(3); June 12 Order at 1-2. Accordingly, Plaintiffs request that the Court finally certify the class for settlement purposes under Fed. R. Civ. Pro. 23(b)(3).

### C.    The Court-Ordered Notice Program Is Constitutionally Sound

Under Rule 23(e), the Court "must direct notice in a reasonable manner to all Class Members who would be bound by a propos[ed settlement]." FED. R. CIV. P. 23(e) (1).  Class Members are entitled to receive "the best notice practicable" under the circumstances. *Burns v. Elrod*, 757 F.2d 151, 154 (7th Cir. 1985).  Notice is satisfactory "if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., L.L.C.*, 361 F.3d at 575 (internal citations omitted).  Moreover, notice that is mailed to each member of a class "who can be identified with reasonable effort" constitutes reasonable notice. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974).  For any certified Rule 23(b)(3) class, the notice must inform Class Members "that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded." FED. R. CIV. P. 23(c)(2)(B).

The notice plan provided for in the Settlement and approved by the Court in its June 12, 2014 Order satisfies the notice standard for all persons who were mailed notice.  In its Preliminary Approval Order, this Court concluded that:

> The Court has reviewed the proposed form of Notice to the Class and finds that it fairly and adequately: (i) describes generally the terms and binding effect of the Settlement and this Settlement Agreement and explains the Plan of Allocation, (ii) gives notice of the time and place of the Final Approval and Fairness Hearing, (iii) describes how an Objection may be made to entry of the Final Approval Order and the deadline for the filing of such Objection, (iv) describes how to opt out of the settlement; (v) describes how Class Counsel will apply to the District Court for an award of

attorneys' fees and costs and the deadline for the filing of such application, and (vi) describes how the Named Plaintiffs will apply to the Court for Class Representative Service Awards, and the deadline for filing of such application. The Court further finds that service of the Class Notice via first class mail, postage prepaid, is the best practicable method of transmitting the Class Notice.

ECF# 388. Plaintiffs formatted this Notice in an easy-to-read manner. The Notice encouraged Class Members to contact the Settlement Administrator or Class Counsel with any questions and provided their telephone numbers, mailing addresses, and/or web contact information. KCC Decl., Ex. A.

To ensure that Class Members could make a fully-informed decision whether to object to or opt out of the Settlement, the Notice Package contained an individual statement of the estimated dollar amount of his or her share of the Settlement and the factors that underlay the calculation of the settlement share. *Id.*, Exh. B. The Settlement provided Class Members with 45 days after the Class Notice of Settlement was mailed to object to or opt out of the Settlement. As of September 19, 2014, only 12 Class Members have requested exclusion, and only one Class Member submitted any objection to the Settlement. KCC Decl., ¶¶ 18-19.

The Parties have now implemented the Notice Plan. The court-appointed Settlement Administrator, KCC, received the list of Class Member names and addresses compiled by Defendants, updated the address list using the National Change of Address system, and mailed the Class Notice and Computation of Estimated Settlement Share Form by first class mail to all persons for whom addresses were locatable. Accordingly, with respect to all Class Members who were mailed notice, the Notice and Notice plan fulfilled all requirements of adequate notice and should be duly approved. *See Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374-75 (9th Cir. 1993); FED. R. CIV. P. 23(C)(2); Manual for Complex Litig. (4th), § 21.312.

With respect to the 266 Class Members who have not yet been mailed deliverable notice (*supra* at Section V), the Parties propose the following:

1.      The Parties agree to create a reserve fund equal to the value of the claims of the 130 Class Members who have not been mailed Notice ("No Address Class

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFFS' MOTION FOR FINAL APPROVAL
CASE NO. 4:08-CV-02993 JSW

Members") and the 136 Class Members who were mailed Notice but whose Notice was returned as undeliverable ("Bad Address Class members") (collectively "Undelivered Notice Class Members").  The value of this reserve fund will be held back from the Settlement, in the Qualified Settlement Fund by KCC, and available to pay any of these 266 Class Members whose address information is obtained within12 months of the final approval order.

2.   Efforts to locate address information for the 130 No Address Class Members will continue.  These efforts will include attempted communication with primary operators who may have contact information for secondary operators.

3.   As any of the 266 Undelivered Notice Class Members are located or come forward, KCC will mail them Notice and provide them with an opportunity to exclude themselves from the Settlement.  Those who are mailed Notice and do not exclude themselves from the Settlement will receive their share of the Settlement and be bound by the Release.

4.   At the end of a one-year period, any of the 266 Undelivered Notice Class Members who have still not been mailed Notice will be excluded from the Settlement and shall not be bound by the Release. The dollars attributable to their shares of settlement will be disbursed to the *cy pres* beneficiary.

The Parties believe that this proposed procedure is the most equitable means of handling the participation of these Class Members.  It will ensure that the Release in this case does not encompass persons who have not been mailed Notice of the Settlement and provided the opportunity to exclude themselves from the Settlement.  *See* 3 *Newberg on Class Actions*, § 8:7 (5th ed.) ("whenever an individual class member's name is known or easily ascertainable, individual notice is mandatory").  At the same time, it will allow additional time for these 258 individuals to come forward or be located, so that they may have the opportunity to participate in the benefits afforded by this Settlement.

**VII.   <u>CONCLUSION</u>**

For the reasons stated above, Plaintiffs respectfully request that the Court grant final approval to the Settlement.


DATED:  September 19, 2014                RUKIN, HYLAND, DORIA & TINDALL, LLP


                                    By:    <u>/s/ *Peter Rukin*</u>
                                           PETER RUKIN
                                           Attorneys for PLAINTIFFS